652 So.2d 1351 (1995)
J. Minos SIMON d/b/a Dixieland Farm, et al., Plaintiffs-Appellees,
v.
FASIG-TIPTON COMPANY, et al., Defendants-Appellants.
No. 92-173.
Court of Appeal of Louisiana, Third Circuit.
March 22, 1995.
Writ Denied June 2, 1995.
*1352 Gerald Charles deLaunay, J. Minos Simon, J. Clemille Simon, Lafayette, Donna K. Brown, Homer, for J. Minos Simon Etc.
Henry Camille Perret, Jr., Ian Alexander Macdonald, Boyd Allen Bryan, John Bradley Wartelle, Lafayette, for L.P. Bud Thibodaux.
James Ray McClelland, Franklin, for Mid-South Guar. Bank.
Joseph Beauregard Olinde Jr., Baton Rouge, for Baton Rouge Bank.
Lisa Brener, Lafayette, for Donald Dupuis.
L. Lane Roy, Lafayette, for Fontenot.
Before YELVERTON, COOKS, SAUNDERS, WOODARD and PETERS, JJ.
COOKS, Judge.
This protracted dispute evolved from the business dealings between J. Minos Simon and L.P. "Bud" Thibodaux. The only fact which the parties readily agree is true and supported by the record, bound in forty-five volumes, is Up The Apalachee was a great *1353 Louisiana bred race horse. Louisiana's good fortune to claim and rejoice over the success of this famed horse resulted, in large measure, from the business union of Simon and Thibodaux. This union, though, did not end on a happy note. It spawned, thus far, nearly a decade of litigation and lodging of the present appeal. Exactly what each undertook to perform and uphold during the union, the gentlemen protest, were clearly understood and each insists the other must tender damages for his breach.

THE EARLY YEARS
Simon, a prominent attorney, owned a ranch and dabbled a bit in raising cattle. In 1977, on the advice of a client, he purchased a thoroughbred mare in foal, although he concedes knowing "nothing about thoroughbred horses" at the time. In 1978, the foal was born and named Sir Cajun Ruler. To ready the horse for racing, Simon hired a trainer. As luck foretold, Sir Cajun Ruler won the first race entered. This victory "excited" Simon who, in haste, concluded such occurred "all the time" in the horse industry.
Simon, who had amassed a sizeable fortune practicing law and investing in various ventures, decided to purchase more horses. He converted his ranch into a horse farm by constructing twenty stalls in an existing barn and a five furlong race track on the premises. Simon soon learned, however, Sir Cajun Ruler's first victory was not a sign of "profits to come." Simon's wins were seldom; and the cost of maintaining the horse farm increased.
From time to time at various tracks during the early years, Simon stated, he became acquainted with a fellow known as "Bud" Thibodaux. Thibodaux, a former board member of the Louisiana Thoroughbred Breeders Association, was experienced in purchasing, raising and breeding horses while Simon was not. Thibodaux, though experienced in these undertakings, possessed limited resources. He was working as a salesperson for a distributor of anti-corrosive agents used in the oil industry. He owned an interest in several horses and involved himself in several joint ventures. None of his "side line" activities, however, netted him substantial profits. On occasions, Thibodaux was employed as an agent.
An agent in the horse industry, we gather from the record, functions much like an agent in the real estate business. As a "middle man," he facilitates the sale between the buyer and seller. For this service, he usually receives a five to ten percent commission from the seller.
Thibodaux was known in racing circles as considerably knowledgeable on the pedigree of horses. Thibodaux explained the information he obtained regarding the pedigree of horses initially was derived from various catalogs collected from horse sales he attended "around the country." In 1976, he accessed (by computer) a source known as Bloodstock research which he then used exclusively to gather pedigree information for himself and others engaged in horse trading. His fee for this service ranged from ten to fifteen dollars. Thibodaux longed for an opportunity to establish himself as a horse breeder.[1] As a breeder of quality horses, Thibodaux undoubtedly reasoned, his services in the horse industry would be in higher demand.
Simon and Thibodaux chatted on occasions. They began discussing how they might further their mutual interest in the horse business by associating. Exactly what each said to the other when forming this association is not memorialized in writing. Each party maintained he trusted the other. Their recollection of the actual "deals" and dates struck differed greatly.

THIBODAUX'S VERSION OF THE ARRANGEMENT
In 1981, according to Thibodaux, he received a telephone call from Simon inquiring *1354 about a horse named Swashbuckle. Simon was interested in purchasing this horse; but he desired Thibodaux's advice regarding the horse's true value. Ultimately, Thibodaux arranged to purchase the horse for Simon. The owner of Swashbuckle offered Thibodaux $2,000 "if Mr. Simon would buy [the horse]." Thibodaux testified he turned down the owner's offer; but he instructed the owner to deduct it from the $60,000 sale price; and, he purchased the horse in Simon's name for $58,000. The "deal" he made with Simon on this occasion was if Simon followed his verbal instructions to the letter on keeping and breeding Swashbuckle in Thibodaux's words: "We could show this horse with some racing potential, I would show him how to make money in the horse business, and we could both profit from that." Further explaining, Thibodaux stated he acquired the horse "for free" with conditions.
After this purchase, Thibodaux stated he received a telephone call from Simon who expressed interest in acquiring "some nice mares." As Simon's agent, he purchased in September 1981 three mares from Triple D Stables for a total price of $165,000.00. Two of the mares were in foal. From the seller, Thibodaux stated, he received a five percent commission equalling $8,250. At the time of this transaction, Thibodaux admitted he did not tell Simon he received this commission. He explained his failure was just a "slip of the tongue," he "wasn't keeping it a secret."
Again, in 1982, Thibodaux testified Simon contacted him and expressed interest in acquiring a horse named Gundoe. As Simon's agent, Thibodaux stated, he negotiated with the owner who agreed to sell the horse to Simon for $80,000. Thibodaux received a ten percent commission equalling $8,000 from the seller. Thibodaux admits, again, he did not tell Simon he collected a commission on the sale of Gundoe. However, Thibodaux insists he told Simon "[he] could buy the horse for $80,000 and [he] wouldn't have to pay the commission." Thibodaux assumed Simon knew from this revelation, the seller was advancing the commission.
According to Thibodaux, in September 1982, he and Simon "agreed to raise horses together." In exchange for his effort in finding quality horses, breeding them, and overseeing Simon's operation at the ranch, Thibodaux maintained, Simon agreed to recognize him as ten percent owner of all horses acquired during the relationship, including their foals; and, Simon agreed to share with him fifty percent of all breeder's awards collected for horses co-bred by him. Further, he alleged Simon "gratuitously" agreed to include all the horses previously acquired before the "arrangement," even those Thibodaux admitted receiving a commission on at the time of purchase. Thibodaux stated he agreed to perform the role of a "managing partner." However, the "deal" did not require him to assume liability for any portion of the expenses associated with upkeeping and breeding the horses; and Simon agreed to reimburse all sums expended by him in connection with the horse operation. He likened the arrangement formed with Simon to a "joint venture."[2]
During the time he and Simon were "finalizing" this arrangement, according to Thibodaux, Simon expressed an interest in buying one-half interest in Louisiana Bloodstock. This corporation was formed by Thibodaux and Rodney Verret the year prior. As partners, each owned 100 shares of stock in the corporation which owned five horses. Simon offered to buy Verret's stock. Thibodaux testified he pondered over the offer for a few days before deciding not to present it to Verret. Instead, Thibodaux stated he proposed that Simon purchase all the horses belonging to the corporation together with *1355 several horses independently owned by Verret. Simon eventually purchased these horses for $333,500.00.[3] When Simon questioned what he wanted out of the deal, Thibodaux testified he responded:
"I will retain ten (10%) percent ownership of the horses, and the subsequent foals, and I want to be co-breeder of the foals. And the, one of the things he said, `Well, when would you get your money?' When we would sell horses, I would be paid my ten (10%) percent." He said, `Well, what would happen if we put horses in a sale and we bought them back?' It would establish a price and then, I would get my ten (10%) percent again."
In December 1982, Thibodaux stated, he negotiated for Simon the purchase of three more horses from the Triple D Stables named Claudelle, Party Up and Pondeli's Belle. In 1983, Party Up gave birth to Louisiana's first grade one New York stakes winner: The horse known as Up the Apalachee. Thibodaux admits receiving a ten percent commission at the time of this sale. Unlike the prior Triple D sales in 1981, according to Thibodaux, the owner decided to pay the commission in cash rather than by check. The cash, Thibodaux adamantly proclaimed, he delivered to Simon at his office; and, Simon handed him $2,000 out of these funds.[4]
In 1984, Thibodaux stated, the arrangement was modified. In addition to receiving ten percent ownership of all horses owned by Simon and fifty percent of all breeder's awards received for horses co-bred, Thibodaux testified, Simon agreed to pay him fifty percent, less expenses, of all "spec horses [sold] by them." As Thibodaux explained "spec horses" are those purchased for a low price and sold for a higher price shortly after acquisition. Described by Thibodaux as a trick in the industry, prices of these horses are artificially inflated by the owner placing large reserves on the horses at auctions; and, then selling when buyers agreed to pay a sum exceeding the reserved amount. For the sum of $6,500.00 Thibodaux negotiated the purchase of three spec horses in 1984, all titled in Simon's name.
In January 1985, Thibodaux testified, the arrangement was modified again. He explained Simon was not having "any fun" just buying and selling horses for profit; and Simon decided "[he wanted] a racing stable." He relates the following exchange occurred between he and Simon:
"Well, why didn't you say that three (3) years ago?" Now we've got all of these horses and in '85 we still don't have anything ready to race. They are just coming into their own. I could have gone out and bought race horses, proven race horses. We wouldn't have had to develop the farm the way it is. We wouldn't have had to spend all this money on these mares. We could have saved a ton of money and the approach would have been totally different. He said, "that's what I want to do. I want to race. I want a racing stable." I said, "okay. I'll develop you a racing stable, with my ten (10%) percent ownership of the horses, that will be ten (10%) percent of the winnings." He said, "you build me a racing stable, you've got it." (Emphasis added).
Thibodaux testified this modification occurred after he became upset over Simon's refusal to sell the "spec horses" at a January auction. Thibodaux stated his "trick" to drive the prices of the "spec horses" higher than their purchase price worked; but instead *1356 of selling Simon placed an unrealistic reserve on these horses and bought them all back. At this stage of their dealings, he questioned Simon's motive and suspected he desired to deprive him of profits agreed upon. A month later, according to Thibodaux, Simon also agreed to advance him $3,000 per month. Simon continued to advance this amount per month through July, 1985.
Thibodaux affirmed his name never appeared on any of the horses' certificates of title during this period as owner; and he did not file any tax documents evidencing his claimed ten percent interest in the horses. Thibodaux explained he did not wish to memorialize his ten percent ownership interest in the horses on the title certificate because he wanted to establish himself as a breeder of quality horses. He asserted listing his ownership interest in the horses would compromise his reputation as a breeder by causing the purchasers to question whether he retained the best horses for himself. His failure to report the alleged ten percent ownership interest in the horses on his tax returns, Thibodaux stated, was to allow Simon to benefit from any tax breaks available for owning the horses. Though he described Simon as meticulous "in documenting things," still he asserted (despite constant urging) Simon failed to memorialize their understandings in writing through the years which followed. He admitted the only documents evidencing any arrangement between he and Simon was an "Exclusive Agent Contract" executed in June 1983. This document, Thibodaux stated, was prepared by Simon only after he kept insisting they "put [their] deal in writing." For his service as Simon's agent, the contract provided Thibodaux would receive ten percent from the sales of Simon's horses. None of the other understandings alleged by Thibodaux was incorporated in this document. Thibodaux stated he told Simon at the time this contract was executed "that [it was] fine for right now, but we still have to get our deal in writing all the way."[5]
During his association with Simon from 1982 to 1985, Thibodaux testified, he negotiated the purchase of approximately twentyfive horses. Except for the three transactions referenced above, Thibodaux stated all commissions earned by him were deducted directly from the price offered Simon.
In July, 1985, Thibodaux stated, Simon telephoned and accused him of listing his name as the owner of certain mares rather than as a breeder. He decided to visit with Simon at his office the same day. He explained to Simon his suspicion on how the error occurred. He stated Simon continued to accuse him of tampering with the forms. At the close of a heated exchange, he told Simon "[he was] not going to listen to this bull" and exited the office. "From that point forward." Thibodaux testified, his relationship with Simon "started deteriorating." A few days later, Thibodaux related, Simon telephoned him to inquire why he should not replace the board fencing at the ranch with pipe fencing. Thibodaux responded by questioning Simon on "who [he was] talking to?" While explaining to Simon why the board fencing was more suited, Thibodaux stated, he "could tell [Simon] was starting to get advice from some other people." Thibodaux testified he also learned Simon had offered to sell all his horses to John Franks. This decision was very disturbing to Thibodaux. On August 17, 1985, Thibodaux confirmed, he telephoned Simon to discuss how certain horses scheduled for auction should be transported to Shreveport. Apparently Simon hired a person to transport the mares at a cheaper price than the person suggested by Thibodaux. Simon's decision again disturbed Thibodaux who stated he then told Simon *1357 "[he] didn't want to be associated with Dixieland Farms[6] anymore and [he] didn't want to be associated with him."
He did agree, however, to appear at the scheduled auction and assist Simon in selling the horses. Two horses were sold at this auction. Thibodaux testified he received a check issued by Fasig-Tipton, the auctioning company, in his name representing funds received for the sale of these horses in October, 1985. However, as he explained, the check should have been issued in Simon's name. He instructed his wife to return the check to Fasig-Tipton with instruction to reissue them in the name of Simon.[7]

SIMON'S VERSION OF THE ARRANGEMENT
On an occasion in 1981, while Simon was conversing with Thibodaux at a race track, Simon testified Thibodaux "started telling" him:
"`Look, I've got computers. I deal in pedigrees of horses. I can give you information on any horse anywhere. I can press the computer and I'll get the layout, printout of how many races a horse won or lost, the mare's history of running. Their history of production.' He said, `I know all about those things. I've been studying. And if ever I can help you, I'd be glad to help you. I see you've got a few horses,' and that sort of stuff."
Later, during the year, Simon testified a friend said he could buy a horse name Swashbuckle for $58,000.00. "Taking [Thibodaux] up on several offers" to help, Simon stated he called Thibodaux to inquire whether he knew anything about the horse. Simon testified he also revealed to Thibodaux his desire to use the horse as a stud for his mares instead of paying stallion fees. Thibodaux agreed to "check into" the matter; and to serve as Simon's negotiating agent. Simon stated he instructed Thibodaux to "get [the horse] as cheap as [possible]." Thibodaux returned and advised Simon could acquire the horse for $58,000.00. Shortly thereafter, Simon related, Thibodaux appeared at his office and revealed his ambition "of being a breeder consultant, so that people can come to [him] and ask for [his] opinion [and] ... advice ... on how to breed their stock." Recalling the conversation, Simon testified Thibodaux stated:
"`I would like to quit my job and I would like to devote my entire life to being a breeding consultant ... I love the horses, I love pedigree. I love all these things.... I don't have the money. I can't become a breeder unless I own a horse or lease a horse ... If I am a breeder, if I could be considered and published as a breeder, then my name will be all over all the racing forms, racing forms... when you go to buy the racing forms the racing forms they show you every horse that is running, and at the top it shows the name of the horse, it shows who bred the horse, it shows who owns the horse, and it shows the mare, the running horse's mama, the running horse's daddy, the mare and the sire. All that is published at the very top of every racing form throughout the country.... That's what I want. I'd like to have my name printed on these forms and on any other publications whenever they mention a horse."
According to Simon, Thibodaux further professed he could assist him in acquiring quality mares and stallions to breed by searching their pedigrees and he could "sell every colt, every foal" produced from those horses because he "knew all kinds of people." Thibodaux also stated, as Simon recalled, he could supervise the operation of the ranch because he did not live very far from it by recommending Simon hire certain people to upkeep the horses and "checking" on the personnel during the day to assure proper feeding and care of the horses. Thibodaux *1358 then expressed, Simon testified, he "wanted three things:"
"One, I want to be recognized on paper, on the publications. So as a co-breeder with you. Secondly, I want ten (10%) percent of all the proceeds when I sell any of the foals that are born of these combinations of horses that I recommend to you ... [and] I want ten (10%) percent of the breeder's award."
Accepting this proposal, Simon admitted he agreed to list Thibodaux as a co-breeder of all foals and to pay him ten percent of all proceeds derived from the sale of foals produced during the relationship. Further, Simon confirmed he agreed to pay Thibodaux ten percent of the breeder's awards received from horses co-bred by him.[8] Later, Simon stated, he gratuitously increased the agreed breeder's award split to Thibodaux from ten percent to forty percent.
Simon did not communicate, again, with Thibodaux until September 1981 when Thibodaux informed he had located three quality mares for breeding which he recommended Simon purchase from the Triple D Stables for $165,000.[9]
On Thibodaux's advice, Simon purchased a horse named Gundoe for $80,000 in September, 1982. "Around the [same] time," Simon testified Thibodaux visited him and revealed he and Rodney Verret held stock in a corporation, named Louisiana Bloodstock, which owned several mares. Thibodaux suggested Simon purchase these mares for breeding. During the course of this discussion, Simon testified Thibodaux assured him the prices of the horses were excellent "[b]ecause [Verrett didn't] want to make a profit, he [wanted] to sell [the horses] for what was paid for [them]." Simon paid $333,500 for the horses; and, this sum was deposited by Thibodaux in Louisiana Bloodstock Corporation's account. Again, on Thibodaux's urging, Simon purchased three more mares from Triple D Stables in December 1982. Simon testified Thibodaux repeated his assurance that he could select quality stallions in 1983 to breed with all the mares he suggested Simon purchase and he promised to "get the best foals [and]... sell them for [him]." Simon continued to purchase horses in 1983 and 1984. He recalled spending in excess of $1,000,000 during his relationship with Thibodaux on horses. Near the end of 1984, Simon owned 54 horses which included the foals bred as a result of Thibodaux's efforts. Although he heeded every suggestion made by Thibodaux, Simon stated by the end of 1984 he received only $130,000 from the sale of horses. Further, Simon testified he "had a lot of expenses" operating the ranch; and "suffered a [combined] loss of about ... [$1,200,000]" by the end of 1984.
Simon explained certain horses owned by him were offered for sale at auctions; and, they were purchased "back" by him at these auctions, again on Thibodaux's advice. According to Simon, Thibodaux suggested that he auction the horses, place large reserves on them, and buy them back either to increase their value on paper or to make them eligible to race in certain competitions which in turn would make them more appealing to buyers.
Faced with mounting losses in the horse business, Simon testified after meeting with his CPA in January, 1985, accompanied by Thibodaux, he decided the best course to take was to "get out of the [horse] business." During the meeting, Simon stated, Thibodaux presented a document purportedly reflecting the least amount Simon could expect to realize for each horse sold. For his efforts in selling the horses as Simon desired, Thibodaux proposed that he receive ten percent of "anything he sells, whether it was the mares or whether it was the foals born of these mares." Although Thibodaux's proposal changed the terms of the earlier agreement, *1359 Simon stated he agreed to pay ten percent of every horse sold as a result of Thibodaux's efforts. During the same meeting, Simon stated Thibodaux also agreed he would not collect a ten percent commission on the horses Simon acquired from Louisiana Bloodstock Corporation for $333,500; and, he agreed the first $333,500 would be exempt from the agreement. After Thibodaux indicated his new undertaking would require him to travel a lot and he needed money to do so, Simon stated he agreed to pay Thibodaux $3,000 per month as advance commission.[10]
According to Simon, by June 1985, Thibodaux only sold one horse. During this month, Simon testified, he decided to offer for sale in writing to John Franks every horse he owned at the values listed by Thibodaux.[11] Franks refused the offer.
Thibodaux then entered three of the horses with Fasig-Tipton for auction sale in August, 1985. Shortly before the auction, Simon stated Thibodaux suggested he hire a fellow to transport his horses and two horses belonging to other owners to Shreveport for sale. When he refused to employ the person recommended by Thibodaux, instead opting to employ a transport company at a cheaper price, Simon stated Thibodaux was not pleased and left him a message that the owners of the other horses did not want them transported by the company he selected. According to Simon, after he discussed the matter with the owners, they agreed to use the cheaper service. This, however, did not "set well" with Thibodaux whose anger, Simon stated, intensified. Thibodaux then accused Simon of "undermining him" and, according to Simon, when he responded by stating instead he was trying to keep Thibodaux "from [frittling] away [his] money," Thibodaux exclaimed "I quit! I quit!" This conversation, Simon stated, occurred on August 17, 1985.
Simon denies entering any joint venture or partnership relationship with Thibodaux. He likened the "arrangement" to an agency relationship asserting Thibodaux served solely as his "agent" throughout their dealings. He denies agreeing to pay Thibodaux any portion of winnings received from racing horses. Although Simon acknowledged executing an "Exclusive Agent Contract" in 1983 appointing Thibodaux as sole agent to sell his horses for a ten percent commission, this document Simon asserted was prepared for use only in the event of his death.
Simon testified in the years which followed he was forced to "take over" full control of his operations and to suffer even greater losses even though Thibodaux assured him the horses purchased and the foals produced during their union were valued higher than eventually sold.

THE AFTERMATH
When Simon and Thibodaux decided to end their association, each charged the other with breaching the relationship and trust shared between them. Thibodaux asserted Simon's action in offering to sell all the horses and in buying back horses entered in auctions evidenced his intent not to honor the agreement and to deprive him of profits from the sale of horses. Simon charged Thibodaux, unknowing to him at the time, accepted commission on horses while serving as his agent; acquired from, sold, and bred Simon's horses by making "sweetheart" deals with his friends; and, breached a fiduciary duty owed to him. He also complained Thibodaux's efforts in the end "netted" him "nothing" but financial woes.

PROCEDURAL HISTORY
Simon filed suit against Fasig-Tipton in 1985 to collect funds owed to him from the *1360 August 24th sale of his horses. After discovering the disputed funds was forwarded by this company to Thibodaux, Simon then joined Thibodaux as a party to the suit.[12] Thibodaux responded by filing a reconventional suit against Simon claiming breach of contract; and, later asserted Simon converted certain sums paid as breeder's awards after their relationship ended. Thibodaux also filed suit against a depository bank (MidSouth National Bank) and three drawee banks (Delta Savings & Loan Association, Inc., Baton Rouge Bank & Trust Company, and First National Bank of Commerce) for cashing (without his signature) certain checks bearing his and Simon's names jointly. He alleged these defendants converted the funds by paying Simon the full amounts. In the years which followed, each party amended their claims. The legal battle between the parties evidenced by the voluminous record lodged with this Court has been fierce and unceasing. Numerous applications for writs were filed by the parties with this Court and the Louisiana Supreme Court prior to trial.
Among other things, Simon alleged:
1. In July 1, 1981 Thibodaux approached him and agreed to represent him in all future transactions of Dixieland Farm, for which Thibodaux would receive ten percent of the profits from the sale of all horses purchased and all foals born in this agency status;
2. That Thibodaux was his fiduciary agent and as such attempted to convert monies produced by a sale of two horses owned by him;
3. Thibodaux violated his fiduciary duty by overpricing two breeding seasons in a stallion by $10,000.00 and receiving this amount as a kickback from the owner of the stallion;
4. Thibodaux misrepresented to him the authority to sell to him a ½ interest of a fractional share in the stallion, Honest Moment, that Thibodaux owned;
5. Thibodaux received from him $18,000.00 as advancements in commission which were unearned; and
6. Thibodaux, through breach of his fiduciary duties, owes him additional monies and should be held to render an accounting.
Countering and reconvening, Thibodaux alleged:
1. Simon approached him in September 1985 and offered to form a partnership and/or joint venture with him, wherein Simon provided the land and capital and he provided his time, knowledge and experience;
2. They entered into a verbal agreement wherein he would obtain a ten percent interest in each horse purchased by Simon and the foals born;
3. He would receive fifty percent of the profit from the sale of "spec" horses purchased by Simon;
4. He would receive fifty percent of all breeder's awards paid for horses listing him as co-breeder;
5. Simon failed to remunerate him for his ten percent ownership interest in horses sold;
6. Simon converted funds belonging to him derived from breeders awards paid;
7. Simon failed to reimburse him for outof-pocket expenses;
8. In the event no partnership and/or joint venture was established, he should be compensated under the doctrine of quantum meruit.
The jury rejected all claims asserted by Simon. On the issues raised by Thibodaux, in reconvention, the jury found Simon failed to pay him $35,315.00 in commissions earned in connection with the sale of horses prior to August 17, 1985. It also found Simon agreed:
1. Thibodaux would receive ten percent ownership interest in every horse purchased *1361 or interest in every horse purchased by or on behalf of J. Minos Simon during the term of the contract and the foals born of those horses;[13]
2. Thibodaux would receive a percentage of any breeder's awards won by all foals for which he and Simon were listed as cobreeders;
3. Thibodaux would receive ten percent of all winnings attributable to every horse purchased by or on behalf of J. Minos Simon or interest in every horse purchased by or on behalf of J. Minos Simon;[14] and
4. He would reimburse Thibodaux for all expenses incurred in connection with the operation and/or supervision of Dixieland Farm.
For Simon's breach of these particulars, the jury awarded Thibodaux $189,983.68. On his conversion claim, the jury awarded Thibodaux $16,367.15 for unpaid breeder's awards; and $158,334.17 in general damages against Simon and MidSouth National Bank. Simon has appealed the jury's findings and assigns four errors for review. MidSouth National Bank also appealed that portion of the verdict casting it liable with Simon on Thibodaux's conversion claim. Thibodaux answered and asserted the judgment, in error, failed to cast Simon and MidSouth liable for certain damages in solido; and, further, the trial judge erred in excluding evidence material to his general damage claim stemming from Simon's breach of contract.

STANDARD OF APPELLATE REVIEW
Exactly "how much deference" appellate courts should accord factfinders has been discussed for decades by legal practitioners and judges. They have memoralized their thoughts in print; and they have qualified their answers by exclaiming"much, great, vast, wide;" and all proclaiming, persuasively, to know how these adjectives modify the constitutional authority of appellate courts to review both law and facts.[15] Added to this vocabulary repertoire are the adjectival phrases"manifest error, abuse of discretion, and clearly wrong." And so, as appellate judges have struggled to remain "in step" with all who profess to know exactly how much deference they should afford the factual findings of judges and jurors they too, repetitively, have said a "court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is clearly wrong," and "where two permissible views of the evidence exists, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Stobart v. State, 617 So.2d 880 (La. 1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993).
Often we have sought and obediently attempted to follow the guidance of the State Supreme Court. On occasions, we have misunderstood the instructions of our teacher court or its expressions on a subject may have caused us, understandably, to place more significance on particular words or phrases than intended in the context used. Such occasion, no doubt, caused the Louisiana Supreme Court in Ambrose v. New Orleans Police Amb. Service, 639 So.2d 216 (La.1994), recently to announce:

*1362 "Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La.1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support."

ANALYSIS
With great care and mindful of our instructor's recent pronouncement, we reviewed the record of this case and all five members of the panel, at last, unanimously agree the jury's verdict was clearly wrong in the particulars discussed below.[16]

THIBODAUX'S CONTRACTUAL CLAIMS
Although Thibodaux initially alleged he formed a partnership and/or joint venture with Simon in 1982, his supplemental and amending pleadings alleged sufficient facts to inform Simon of the nature of his contractual claims and to state a cause of action. Louisiana Civil Code article 1779 sets forth the requisites for a valid contract: (1) Parties legally capable of contracting; (2) their consent legally given; (3) a certain object, which forms the matter of agreement; and (4) a lawful purpose.[17] All of these requisites were met in the present case; and Simon does not contend the contrary. Rather, he argues Thibodaux's error in initially naming the arrangement between them a partnership and/or joint venture somehow prevents judicial recognition of his claims; and Thibodaux's attempts at trial to generically refer to the "arrangement" impermissively expanded the pleading. Louisiana Civil Code article 1761 defines a contract as an "agreement by two or more parties whereby obligations are created, modified, or extinguished." Whatever title each ascribes to their "arrangement or agreement" has no negating consequence in law or fact to the formation of a contract in this case. Thibodaux alleged he offered to perform certain services for a price and Simon, after accepting the offer, failed to honor it. These allegations were sufficient to state a cause of action sounding in contract. The facts specifically plead by Thibodaux were sufficient to articulate the nature of the obligations he alleged Simon agreed to undertake and breached.
After examining the record, we are satisfied the jury did not err and the evidence preponderates in Thibodaux's favor that a valid contractual relationship existed between he and Simon. Although the date the "agreement" was formed is disputed by the parties, Simon does not deny he accepted Thibodaux's oral proposal to assist him in supervising his ranch and acquiring, breeding, and selling horses. These services constituted the object of the agreement; and *1363 Simon also does not deny he agreed to compensate Thibodaux.[18] The parties were legally capable of contracting; and, there was a lawful purpose. Only the amount of the remuneration promised is factually contested by the parties.
Simon insists he initially agreed to recognize Thibodaux as a co-breeder of the foals born during the relationship; to pay him ten percent of all breeder's awards received for these foals; and to pay him ten percent of the proceeds derived from the sale of foals resulting from his breeding efforts. Simon admits he later agreed to pay Thibodaux forty percent of all breeder's awards on horses co-bred by Thibodaux and ten percent of all horses sold as a result of Thibodaux's effort (whether or not co-bred by him or acquired before or during the relationship).
In stating his claims, Thibodaux does not allege Simon breached his promise to list him as a co-breeder of the foals born during their relationship; and, the evidence confirms Simon fullfilled this obligation. Simon testified he only agreed to pay Thibodaux forty percent of all breeder's awards received for foals which he co-bred; while Thibodaux insists he agreed to pay him fifty percent of such awards. Only ten percent separate the parties from agreement. Unfortunately, the jury was required to resolve the dispute.[19] Our search through the record has not yielded a definitive answer one way or the other. The jury's decision to tip the scale in favor of Thibodaux, even if supported legally only by equity, was not clearly wrong. Where there is a contract for the rendering of services but the parties' "minds do not meet" or no agreement exists on the price or compensation due for such services, the law implies as a condition of the contract that the party receiving the services intended to "reasonably" compensate the party performing the services. Porter v. Johnson, 408 So.2d 961 (La.App. 2nd Cir. 1981), writ denied, 412 So.2d 99 (La.1982); Doll v. Albert Weiblen Marble & Granite Co., 207 La. 769, 22 So.2d 59 (1945). Although we are convinced the evidence shows the parties' minds did not meet on the contemplated percentage split, the absence of accord on this aspect does not vitiate the contract. Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, et al, 538 So.2d 569 (La.1989). The law implies that Simon intended to pay Thibodaux a reasonable sum for his services. Porter v. Johnson, Supra. In determining what amount is reasonable under the circumstances, the jury was not required to apply any specific test or axiom; rather, they were bound to follow only the dictates of "equity" as understood in our civilian system. Jones *1364 v. City of Lake Charles, 295 So.2d 914 (La. App. 3d Cir.1974). Simon admits he relied totally on Thibodaux's knowledge and advice concerning the breeding of his mares; and, he too agreed a higher sum should be paid Thibodaux for his efforts in this regard than the ten percent he alleged Thibodaux agreed to accept. Instead of the forty percent which Simon gratuitously confessed should be paid Thibodaux, we think the award to Thibodaux representing fifty percent of the stipulated breeder's awards and totalling $16,367.15 is reasonable and legally sound.
More troublesome, however, is the parties' dispute on the additional compensation owed by Simon for the services Thibodaux rendered. In addition to listing him as a cobreeder and paying him a percentage of the breeder's awards, Simon insists he only agreed, initially, to pay Thibodaux ten percent of the proceeds derived from the sale of foals produced as a result of Thibodaux's industry. He acknowledges in 1983 he prepared and executed an "Exclusive Agent Contract" obligating himself in writing to pay Thibodaux ten percent of the proceeds received from the sale of all horses during their association. Simon, however, seeks to limit the legal effect of this instrument by insisting its terms was not operative until the date of his death. Thibodaux, on the other hand, insists Simon initially promised to recognize him as a ten percent owner of all horses acquired during their association; and, later, Simon included in the agreement all horses acquired before their association and promised him a ten percent share of the horses' winnings. Thibodaux contends Simon also agreed to reimburse him fully for all expenses paid in connection with Simon's horse operation. Simon does not deny the agreement was modified. As mentioned, Simon testified he agreed to pay Thibodaux ten percent of all proceeds derived from the sale of horses during their association, as opposed to just paying ten percent of the sale proceeds received for foals co-bred; but he vehemently denies ever promising to pay Thibodaux ten percent of winnings received from race horses or to recognize him as a ten percent owner of his horses. He does not deny agreeing to pay Thibodaux out-of-pocket expenses; but, he maintains the evidence presented by Thibodaux to substantiate the claim was insufficient to established the indebtedness.
We find the jury manifestly erred in concluding the parties' "minds met" on the additional compensation Thibodaux was to receive for the services he agreed to perform. We are convinced the evidence overwhelmingly suggests the parties did not strike accord on the remuneration portion of the contract. Both parties acknowledged this portion of the agreement was modified several times; and each party's recollection of the additional remuneration contemplated and subsequent modifications differed substantially. We note, as well, Thibodaux testified because he owned ten percent of Simon's horses, then ten percent of the winnings should follow from his ownership interest. This assumption did not initially result from any conversations with Simon; but rather, as Thibodaux explained, it just went "hand and hand" with his claimed ownership interest. He asserted this claimed winning interest was "solidified," later, in 1985 when he agreed to help Simon convert his operation to a racing stable.
The parties also disputed the meaning and effect of the "Exclusive Agent Contract" they executed in 1983. This is the only document bearing both parties' signatures which speaks on the remuneration promised. Thibodaux asserted the compensation promised in this instrument was not all that was agreed upon; and Simon maintained the document was not intended as binding on either party until the date of his death. The parties' contentions regarding the effect of this document further convinces us there simply was "no meeting of minds" or "concluded agreement" on the remuneration Simon promised to pay and Thibodaux agreed to accept for his services. This failure, however, does not void the contract existing between them. As discussed, the law permits the factfinder to judge from the circumstances surrounding their dealings that Simon *1365 agreed to pay Thibodaux a reasonable sum for his services. Except for the commissions Thibodaux accepted in 1981 and 1982, he provided valued services to Simon from 1982 through 1985 without receiving full and just compensation. It is unreasonable to presume Thibodaux provided such services without expectation of compensation; or he did so only expecting that Simon list him as a co-breeder of the foals born during their relationship and pay him a percentage of the breeder's awards. While Simon argues the services actually provided by Thibodaux could have been obtained elsewhere, he does not dispute he agreed to pay Thibodaux for his labor and advice. In correspondence addressed to the Louisiana Breeders Thoroughbred Association dated September 17, 1985 Simon acknowledged Thibodaux functioned as his advisor for breeding purposes and exercised complete supervision over his thoroughbred horse operation which included selection of studs; the place and time of breeding and foaling; the horses to buy and sell; the feed to buy and from whom; and the employees to hire and fire. Simon admitted in addition to paying Thibodaux a percentage of all breeding fees, he agreed to pay "cash compensation."
Thibodaux first sought, in his prayor for relief, a monetary award for Simon's alleged breach of contract sufficient to compensate him for his claimed ten percent interest in Simon's operation. Thibodaux submitted in original, amending, and supplemental pleadings he is entitled to receive as damages ten percent of the proceeds from sales of horses occurring during the venture; ten percent of the fair market value of mares and foals owned by Simon after the venture ended; ten percent of the winnings from horses subject to the venture; ten percent of stallion shares acquired during the venture; fifty percent of profits from the sale of "spec horses;" expenses incurred during the venture; and a percentage of breeder's awards received for horses co-bred by him, plus recognition as a co-breeder of certain unaccredited foals. Thibodaux pled in the alternative for judicial recognition of his ten percent ownership interest in Simon's horses and for partition by licitation of the claimed interest. In interrogatories submitted to the jury, however, he sought only damages for Simon's breach of contract and commissions he alleged Simon owed him prior to termination of the relationship. Thibodaux has not assigned as error the jury's rejection of his claim for fifty percent of the profits derived from the sale of "spec horses.
From the record exhibits, we have compiled the following list of horses which Thibodaux claimed were subject to the venture, noting the values assigned the horses by Thibodaux and the actual sale prices received by Simon or other status of the horses on the date of trial, if known:

Horse Thibodaux's Purchase Stud Fee Sale Price Other Status*
 Valuation Price
Party Up $ 200,000 $ 30,000 Simon
Up The Apalachee $ 700,000 $ 11,500 Simon
Over The Apalachee $ 150,000 $ 13,000 Simon
With No Malice $ 100,000 Died
Up Your Dukes $ 80,000 Simon
Transparty $ 4,000 $ 5,000 $ 3,500
Claudelle $ 15,000 $ 60,000 Simon
Dixie Mocassan $ 16,000 $ 10,000 $ 8,000
Claudewan $ 16,000 $ 10,000
Seascape Mist $ 64,000 $ 85,000 Simon
Escaping Mist $ 40,000 $ 17,000
Silent Seaman $ 18,000 Donated
Raja Mist $ 5,000 Simon

*1366
Marshua's Nymph $ 15,000 Simon
Misty Leader $ 30,000 Simon
Contrarian $ 65,000 $ 37,000 Simon
Clever Jolle $ 55,000 $ 350
Mais No Man $ 10,000 Donated
Au Contrian $ 30,000 Simon
Quite Contrary $ 20,000 Simon
Narrow Vision $ 25,000 Died
Satanic Power $ 15,000 $ 6,000 $ 8,500
Marshua's Devil $ 15,000 $ 2,500
Red N'Ade $ 5,000 $ 4,600
Red Jumper $ 5,000 Simon
Bold Like Jennifer $ 10,000 Simon
Pleasurable Moment $ 14,000 $ 7,500 $ 14,000
She's Gotta Go $ 10,000 $ 10,000 $ 393
He's An Avenger $ 20,000 $ 10,500
Mon' Homme $ 7,500 Donated
Staunch A Go Go $ 12,000 $ 5,000 Simon
Gone Dancing $ 10,000 Simon
Squadrone $ 7,500 $ 400
Raiser Smart $ 100,000 $ 50,000 $ 600
Native of Dixie $ 20,000 Donated
Tippy Toe Dancer $ 20,000 $ 3,000
Smart Lady Tudor $ 50,000 $ 30,000 Simon
Smart N Pacific $ 2,000 Donated
Some Smart Lady $ 12,000 Simon
Smart Dancer $ 10,000 Simon
Squad Girl $ 10,000 $ 35,000 $ 300
Kleen Kop $ 8,500 $ 5,000 $ 8,500
Savage Simon $ 7,500 $ 10,000
Jig Time Dancer $ 9,000 $ 500
Tudor Lass $ 100,000 $100,000
Exclusive Carleen $ 23,000 $ 15,000 Unknown
Smooth Lass $ 8,500 $ 7,875
Modred Song $ 6,250 $ 12,500
Win Maryea $ 15,000 $ 15,000 $ 8,000
Honest Vita $ 40,000 Simon
C'est La Vita $ 15,000 $ 400
La Vita's Infinity $ 20,000 Simon
La Vita's Bomb $ 25,000 Simon
Jeanie's Explosion $ 25,000 Simon
Nile Commander $ 4,000 Died
Dixie's Mitey Mock $ 37,500 $ 37,500
Flying Cannon $ 20,000 Unknown
Honest Pago $ 8,500 $ 175
Pogo Pal $ 10,000 $ 5,000 $ 350
Palling Around $ 5,000 Simon
Pondelli's Belle $ 1,000 $ 5,000 $ 450
Pocket O'Dixie $ 15,000 $10,000 $ 50
Beau of the Nile $ 2,500 Died
Belle of the Nile $ 1,900 $ 1,900
Nile's Reneged $ 2,000 Unknown
Charging Rose $ 10,000 $ 300
Runner's Pleasure $ 15,000 Simon
Private Runner $ 2,000 Simon
Saint May $ 60,000 $ 10,000 $ 20,000
Bid List $ 15,000 $ 7,500
Angelic Dancer $ 50,000 Simon

*1367
Seed Money $ 20,000 $ 75,000 Donated
Cannonative $ 65,000 Unknown
Seminal N. Gusty $ 4,000 $ 7,500
Tribal Envoy & Foal $ 35,000 $ 8,000 $ 25,000
Prominent Beauty $ 5,000 $ 300
Up Your Bet $ 5,000 $ 400
Lt. Pleasure $ 60,000 $ 37,000 Donated
Squeeze Tyte $ 20,000 $ 10,000 $ 450
Tyte Spring $ 10,000 $ 500
Be My Squeeze $ 4,000 $ 420
 Totals $2,807,150 $512,000 $ 78,000 $ 334,213
* Under other status we have referenced every horse still in Simon's possession at the time of trial by noting his name. Simon also testified he donated horses to several state universities.

The jury awarded Thibodaux $35,315.00 for commissions allegedly earned prior to August 17, 1985, the date both parties testified their relationship ended. The jury also awarded him $189,983.68 for damages sustained as a result of Simon's breach of contract. Serving as his own expert, as noted on the chart above, Thibodaux valued the breeding and racing stock subject to the venture at $2,807,150.00. He assigned $353,150.00 of this figure as the "true" value of horses sold by Simon prior to the breakup; and, claimed on the date the relationship ended he was entitled to receive a ten percent commission on the horses thus sold equalling $35,315.00. The jury obviously based its calculation of commissions due Thibodaux entirely on his testimony. However, the figure assigned by Thibodaux as the total amount received by Simon for horses sold prior to August 17, 1985 included horses Simon claimed by paying the reserves placed on them at public auctions. These horses were never conveyed to third parties. In the latter instances, Thibodaux asserted the "buy back" amounts reflected the fair value of the horses. Curiously, he valued Tudor Lass at $100,000, the amount received by Simon from Perez despite his testimony that this sale was a tax scam because Tudor Lass' value was much less. Thibodaux admitted he told Simon Tudor Lass was "worth a ham sandwich" [and] "if [Simon] put her in a sale maybe [he'd] get a thousand dollars...."
In assigning values to the remaining horses which he claimed were subject to the venture, Thibodaux testified he would have sold a number of the horses at various sales; and, in his expert opinion, the horses would have sold or appraised at the values he now claims as damages. We are not bound to accept the values expressed by experts "since they are not ordinarily conclusive and are generally regarded as advisory in character." State, DOTD v. Van Willett, 386 So.2d 1023 (La.App. 3d Cir.), writ denied, 392 So.2d 692 (La.1980). Although we are not inclined to reject Thibodaux's valuation testimony merely because he is a party litigant, we are not required to except it in toto. Van Willett, supra. Thibodaux has an interest in the outcome of the case. We have reviewed with great caution the values assigned by him. Thibodaux testified, if still associated with Simon in 1988, he would have taken Up The Apalachee and Party Up to the Night of the Stars sale in Kentucky; and, in his expert opinion, Up the Apalachee would have sold for "roughly" $700,000 and Party Up for $200,000, plus. In the case of Over the Apalachee, a full brother to Up the Apalachee, Thibodaux testified if "he would have qualified for the select sale in Kentucky in 1988," again in his expert opinion, the horse would have sold for $150,000. He admitted at the time of trial this horse was worth "about ten thousand dollars." He assigned a value of $100,000 to With No Malice, also a full brother to Up the Apalachee and Over the Apalachee, testifying this horse "could have been worth the same amount of money as Over the Apalachee." This horse ran one time, broke a leg, and died. Thibodaux valued Raiser Smart at $100,000. Yet, the horse was purchased for $50,000 and sold for $600.00. While Thibodaux acknowledged the actual value received by Simon for many of the horses listed was much less, he validates his estimations either by blaming Simon for not selling the horses sooner or racing them.
*1368 On cross, Thibodaux testified he advised Simon at the beginning of the relationship that the horse business was very risky; and, Simon would be lucky if he broke even. He further stated the value of horses fluctuates for a number of reasons; and, it would have been foolish to assure Simon he would realize a certain value for each horse or that he could sell all the horses born during the relationship. We gather from Thibodaux's testimony the horse market is volatile and uncertain. Thus, we decline to accept his valuations as conclusive.
Our task in reviewing the jury's award to determine whether it reflects "reasonable" compensation for Thibodaux's services is made difficult by the absence of other expert testimony in the record. Nevertheless, we cannot shirk our responsibility. The jury awarded Thibodaux a total of $225,133.68 for his contractual claims. We find this award unreasonable under the circumstances; and, it is manifestly contrary to the record evidence. Thibodaux claimed entitlement to winnings from horses acquired or born during the venture; yet he acknowledged his claim was based in part on an assumption that his ten percent ownership interest entitled him to receive ten percent of the winnings from Simon's horses. This assumption he admits was not solidified until January 1985 when Simon decided to develop a racing rather than breeding stable. Thibodaux testified he told Simon he would develop a racing stable, if, in addition to his ten percent ownership interest in the horses, he would also receive ten percent of the horses' winnings. According to him, Simon responded "you build me a racing stable, you've got it." This arrangement was modified, however, shortly thereafter when Simon informed Thibodaux he desired to liquidate his interest in most of the horses owned; and, Thibodaux agreed to actively pursue finding buyers for these horses and to accept ten percent of the sell price. Simon further paid Thibodaux $3,000 per month as an advance on commissions which he expected to earn from the sale of Simon's horses. His energy, from January to the date the relationship ended, admittedly was invested primarily in ferreting out buyers for Simon's horses rather than developing a racing stable for Simon. We believe it unreasonable to grant him a share of the winnings derived from Simon's horses for services which Thibodaux initially promised; but he did not deliver because of his later promise to sell the horses with all deliberate speed and agreement to accept ten percent of the proceeds from these sales. Even if we accept Thibodaux's representations as credible, Simon's promise to pay him ten percent of the winnings was conditioned on an expectation that Thibodaux would invest his skills in converting Simon's operation to a racing stable. Further, Thibodaux's value estimation are disturbingly optimistic and based in part on conjecture and speculation. Thus, we find an award of $150,000.00 reasonable and adequate to additionally compensate Thibodaux for his services and expenses during the venture.[20]

THIBODAUX'S CONVERSION CLAIMS
As discussed, we affirm that portion of the jury's verdict awarding Thibodaux fifty percent of the stipulated breeder's awards paid after the relationship ended totalling $16,367.15. Thibodaux further alleged the breeder's awards were paid by checks made payable jointly to "J. Minos Simon and L.P. Thibodaux" and Simon, the depository and drawee banks all "willfully and/or negligently converted funds belonging to [him]" by refusing to tender payment of the funds after amicable demand. Specifically, he maintained Simon's liability hinges on his act of depositing the sum in his bank account without first securing Thibodaux's signature. Further, he asserted MidSouth Bank, acting as depository, accepted the checks and presented them to the drawee banks for payment. After the checks were honored, MidSouth credited Simon's account. The drawee *1369 banks honored the checks without his signature. These defendants, Thibodaux alleged, by their combined acts and failure to tender the funds on demand converted funds belonging to him. As a result, Thibodaux claimed (at trial) he was entitled to an award for not only special damages representing the amount of breeder's awards due him but general damages as well. In addition to the special damages noted, the jury awarded him $158,000 as general damages against Simon and MidSouth Bank. Thibodaux settled his claims against the other defendants prior to trial; and, they were dismissed as parties.
Any wrongful exercise or assumption of authority over another's goods, depriving him of the possession (permanently or for an indefinite time) is a conversion. Labbe v. Premier Bank, 618 So.2d 45 (La. App. 3d Cir.1993). This right extends to the owner of a negotiable instrument. In Daube v. Bruno, 493 So.2d 606 (La.1986), the Louisiana Supreme Court noted:
"Whenever an owner's right to possession of an instrument is seriously interfered with, the owner has a cause of action in tort for conversion against the person causing the interference. An owner's right to possession is seriously interfered with when another person has exercised control or dominion over the instrument. An instrument is converted when, for example, it has been purchased, payment has been made to an improper party or there has been a refusal to return the instrument to the owner. Hawkland & Lawrence UCC Series Sec. 3-419.01 (Art. 3)."
In interpreting Uniform Commercial Code § 3-419, in effect at the time the acts alleged were committed, courts held this provision authorized a cause of action for conversion by a payee of a check against depository and drawee banks stemming from the handling of instruments under certain circumstances.[21]Daube, supra. See also, Hawkland, & Lawrence UCC series § 3-419.03; J. White & R. Summers, Uniform Commercial Code § 5-16, 586 (1980). As stated by the Louisiana Supreme Court in Daube, supra, this provision only identified "a few patterns of wrongful or improper conduct" which give rise to a cause of action for conversion. It was not intended as all inclusive. In Edwards v. Max Thieme Chevrolet, 191 So. 569 (La.App.2d Cir.1939), the court held "one who aids and abets another in keeping property from its rightful owner is guilty of conversion...." Based on the acts alleged, Thibodaux stated a cause of action against Simon and MidSouth Bank; and he presented sufficient evidence to establish that Simon and MidSouth Bank wrongfully converted funds belonging to him. Issues of fault, intent, negligence, knowledge or ignorance, and/or good faith are not involved in actions for tortious conversion. Labbe supra; Lincecum v. Smith, 287 So.2d 625 (La. App. 3d Cir.1973), writ refused, 290 So.2d 904 (La.1974).
However, we are convinced the jury's award of $158,000 to Thibodaux as general damages, included amounts which are not recoverable in an action for conversion. The award is legally infirm and the jury's finding is not supported by the evidence. Traditionally, courts have said, "damages for conversion consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of the conversion." Hagberg v. Manuel, 525 So.2d 19 (La.App. 3d Cir.1988); Boisdore v. International City Bank & Trust Co., 361 So.2d 925 (La.App. 4th Cir.), writ denied, 363 So.2d 1384 (La.1978). Damages for mental anguish and inconvenience arising from lost use of the property also have been awarded in such cases. Alexander v. Qwik Change Car Center, Inc., 352 So.2d 188 (La.1977); Nassau Realty Co., Inc. v. Brown, 332 So.2d *1370 206 (La.1976); Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1958). Although a few courts have extended the measure of damages to include recovery for the effect on a payee's credit rating, Christmas shopping, and other incidental such as "overdrawn charges," we have not discovered any cases awarding damages associated with the sale of a payee's residence or attorney's fees incurred by the payee to collect the converted funds or the other "incidentals" alleged by Thibodaux. Attorney fees are not allowed in Louisiana except where authorized by statute or contract. Hernandez, supra. No such statute or contract permits assessment of such fees in this case.
Thibodaux testified he sustained "additional" damages as a result of Simon's failure to pay him breeder's awards because in 1989 he "had to take a second mortgage on [his] house to defend [himself] in this lawsuit." Unable to pay the interest due on the second mortgage, Thibodaux stated, he was forced eventually to sell his home for much less than the value to prevent foreclosure by the bank. Despite repeated objections by Simon's counsel to this line of questioning, Thibodaux was allowed to further testify he sold the home for $93,500 although it was appraised at $189,000. Thibodaux testified he also was required to "cash in some whole life insurance policies" to pay $3,000 in repair expenses on the home before the sale and to pay moving expenses. When asked whether he sustained any other damages, Thibodaux stated Simon's failure to pay him the claimed breeder's awards "prevented [him] ... from [traveling] to the sales in Kentucky .... to buy spec horses ... [that he] could resell." Regarding the mental anguish he sustained, Thibodaux testified:
A. "Well, the anxiety over losing the house, and plus the anxiety with the thought of maybe losing the house in 1988, I ended up with some terrible migraine headaches, that I ended up going to the doctor to get
A. So, anyway, I ended going to the doctor and had a brain scan run, just to see if maybe there could have been something worse than what I thought it was.
Finally, Thibodaux was asked whether Simon's conduct had any affect on his position with the Louisiana Thoroughbred Breeders Association. He responded:
A. Well, I've been serving on the Board of Directors of the LTBA since 1981. And there's about fourteen (14) of us on that board. And everybody was asking questions about what the heck is going on. And there were letters coming in from Mr. Simon, accusing me of being devising [sic] kickback schemes, and being a liar, a thief, and some of these letters were read at the board.
* * * * * *
A. I had to justify my position a couple of times.
On cross, Thibodaux confirmed at the time he left the venture, his net worth was $400,000, which included cash in the bank, stocks valued at $45,000, and $75,000 in value assigned to horses owned by him. He admitted sustaining "reverses" in the horse business after he left Simon noting two of his horses died. While he earned "some money" from boarding horses on a farm, he was unable to find steady employment prior to the sale of his home. This failure, he attributes, partly to "downturns" in the oil industry. He also admitted the unstable oil industry caused his home to "go down" in value.
The damages Thibodaux claims for the loss of his home, cashing in life insurance policies, being unable to travel to Kentucky, and having to justify his position with Board members of the Louisiana Thoroughbred Breeders Association are all too remote to legally relate them causally to the alleged acts of conversion. Thibodaux testified he secured a second mortgage on his home to pay the expenses associated with the present litigation which he eventually was unable to pay. To award him damages for the loss of his home is tantamount to recognizing him entitled *1371 to expenses and attorney's fees in this case as separate items of damages. Further, Thibodaux did not allege Simon libelled or slandered him by addressing correspondence or otherwise conversing with the Louisiana Thoroughbred Breeders Association. Any damages sustained by him in justifying his position to members of the Board, though possibly recoverable in a defamation action, is not easily associated with a claim resting solely on conversion. Whether Thibodaux would have travelled to Kentucky, purchased spec horses, and resold them is also too speculative a consequence to relate to Simon's conduct.
Thibodaux is entitled to an award of damages for mental anguish. He admitted, however, his suffering was directly related (in large part) to the loss of his home rather than Simon's conduct. We, therefore, award him $25,000 as general damages for mental anguish and inconveniences endured by him directly resulting from the acts alleged.[22]

MIDSOUTH BANK'S CONTENTIONS ON APPEAL
We have reviewed all the issues and arguments advanced by MidSouth and rule accordingly. For reasons assigned, we award Thibodaux fifty percent of the breeder's award which Simon stipulated equalled $16,367.15. MidSouth's argument that this figure is greater than that actually due Thibodaux comes too late. It should have offered evidence to the contrary at trial on the merits or contested the stipulation entered.
Further, we are not persuaded by MidSouth's argument attacking the sufficiency of Thibodaux's pleading in articulating the relief he claimed. In his prayor, Thibodaux asked for "all general and equitable relief, etc" against defendants in reconvention. LSA-C.C.P. art. 862 provides a final judgment shall grant the relief which a party is entitled, even if the party has not demanded such relief in his pleadings and the pleadings contain no prayor for general and equitable relief. Prejean v. Commonwealth, 503 So.2d 661 (La.App. 3d Cir.1987). This argument lacks merit.
Likewise, we find MidSouth's contention that the interest of justice requires granting it a new trial because of certain alleged representations by defense counsel without merit. MidSouth argues the trial court should have granted its motion for a new trial because its attorneys were denied the opportunity to appear in court. MidSouth asserts it did not appear because it relied upon the assurances of Thibodaux's attorneys that they were not "going after" it.
LSA-C.C.P. art. 1973 provides "a new trial may be granted if there is good grounds therefor, except as otherwise provided by law." The proper application of LSA-C.C. art. 1973 depends on the facts and circumstances of each case. Laprarie v. King, 575 So.2d 921 (La.App.2d Cir.1991), writ denied, 578 So.2d 140 (La.1991). When a trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered. A trial judge's determination should only be set aside in cases of manifest abuse of discretion. Laprarie, supra.
MidSouth participated in the litigation until the time of trial. There is no settlement agreement between MidSouth and Thibodaux in the record evidencing an agreement by Thibodaux that he would not pursue his claims against MidSouth. Nor are we convinced there has been a gross miscarriage of justice with MidSouth's failure to appear. See West Consolidated Co., Inc. v. Creole Fisheries, 616 So.2d 268 (La.App. 2d Cir. 1993). On this record, we conclude the trial court did not abuse its discretion in denying the motion for a new trial.
The assessment of 22% cost to MidSouth is a matter on which the trial court is entitled to exercise much discretion. We do not find *1372 this percentage abusive under the circumstances. MidSouth's decision not to participate at the trial does not lessen the court's discretion to cast it with a percentage of trial costs.
Finally, we address MidSouth's argument that the release of the drawee banks by Thibodaux prior to trial also released it from responsibility for the acts of conversion alleged or proportionately reduced its liability on the claim. LSA-C.C. arts. 1803 and 1804, enacted in 1985 (prior to the date of the alleged acts of conversion) provides:
Article 1803
"Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor.
Surrender to one solidary obligor of the instrument evidencing the obligation gives rise to a presumption that the remission of debt was intended for the benefits of all the solidary obligors."
Article 1804
Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasioffense, a virile portion is proportionate to the fault of each obligor.
Consistent with these provisions, "Louisiana Courts have long recognized when a plaintiff settles with and releases one of several joint tortfeasors, he, thereby deprives the remaining obligors of the right to contribution against the released obligor." Taylor v. U.S. Fidelity and Guaranty Company, 630 So.2d 237 (La.1993). Thus, prior to adoption of comparative fault in Louisiana, "proof by the remaining obligors of fault on the part of the released obligor give rise to a reduction in the plaintiff's recovery against the remaining obligors in proportion to the total number of obligors found to be solidarily liable." Taylor, supra; Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App. 3d Cir.1964). With the adoption of comparative fault came the concept of apportioning fault among joint tortfeasors who are solidarily liable. Accordingly, instead of reducing plaintiff's recovery against the remaining released obligors in proportion to the total number of solidary obligors, "the rule emerged that a plaintiff's settlement with one solidary obligor reduces his recovery against the remaining obligor by the percentage of the proportionate fault of the released obligor." Buckbee v. Aweco, Inc., 614 So.2d 1233 (La.1993); Dill v. State, DOTD, 545 So.2d 994 (La.1989). This change in the method employed by courts to limit plaintiff's right of recovery against solidary obligors, when one or several are released, did not "unsettle" existing jurisprudence long holding that such reductions are appropriate "only when the remaining defendants prove at trial that the released party was a joint tortfeasor and therefore solidarily liable." Taylor v. U.S. Fidelity and Guaranty Co., supra; Raley v. Carter, 412 So.2d 1045 (La.1982). It matters not that one of the parties may have pled the released defendants are joint or solidary tortfeasors. Raley v. Carter, supra, at 1047. In this case, no evidence was presented at trial to prove or negate liability on the part of the released defendants by Simon, Thibodaux, or MidSouth Bank. Without such evidence in the record, we are prevented from using any formula to reduce Thibodaux's recovery by the portion assignable to the released obligor.[23]
Next, we turn to address whether MidSouth and Simon are solidarily liable to Thibodaux for the damages sustained as a *1373 result of the conversion of breeder's awards. These defendants through their "joint conduct" deprived Thibodaux of the funds due him. As noted in Touchard v. Williams, 617 So.2d 885 (La.1993), "Solidary liability among co-tortfeasors has been a part of Louisiana's civil tradition for over 150 years." LSA-C.C. art. 2324 in relevant part, as amended in 1979, provided:
"He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act."
This provision was derived from article 2304 of the 1825 Louisiana Civil Code which created solidary liability among joint tortfeasors who acted in consert. Touchard, supra. In effect, solidary liability allows a plaintiff to demand payment of the entire judgment from any one of the tortfeasors liable in solido. Joseph v. Ford Motor Co., 509 So.2d 1 (La.1987). The tortfeasors are then left to seek contribution or indemnity from each other. As noted in Touchard, supra, "a solvent defendant was subject to paying the tab for other defendants who are insolvent, undeterminable, or hidden."
In 1987, the Legislature amended Article 2324 to "[address] the problem of burdening solvent defendants, who were minimally or not exclusively liable, with 100% of a plaintiff's damage." As amended the Article read:
A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering, injury, death or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
While preserving in solido liability among joint tortfeasors, the amendment in effect limits their individual exposure for the payment of plaintiff's recoverable damages to fifty percent, as opposed to one hundred percent. However, the limitation enacted by legislative amendment of Article 2324 does not apply to joint tortfeasors who commit "intentional or willful acts;" and it does not eliminate solidary liability among joint tortfeasors. LSA-C.C. art. 2324(A); Touchard, supra. Tortfeasors bound in solido who commit intentional torts are still generally answerable each for the full damages awarded plaintiff. Conversion is an intentional act which deprives a person of his possession. Mauboules v. Broussard Rice Mills, 379 So.2d 1196 (La.App. 3d Cir.1980), writ denied, 381 So.2d 1234 (La.1980). Accordingly, we find Simon and MidSouth liable in solido for the damages sustained by Thibodaux as a result of their wrongful retention of breeder's awards owed him.

SIMON'S CONTENTION ON APPEAL
By original, supplemental, and amending petitions Simon claimed Thibodaux breached a fiduciary duty owed him while serving as his agent by accepting "kickbacks" and making "sweet heart" deals with friends; converting funds and breeding horses belonging to him; making false representations to him; *1374 and failing to return to him $18,000 in alleged unearned advanced commission. Like the jury, we find Simon failed to present sufficient evidence to establish Thibodaux breached a fiduciary duty owed him or wrongfully converted the breeding services of Simon's horse named Swashbuckle.[24] We note in particular Simon's allegation that Thibodaux accepted "kickbacks" factually hinges on the date the parties actually entered the venture which forms the subject of this action. As mentioned, Thibodaux contends he did not agree to serve as Simon's agent until September, 1982; while Simon maintains the agency relationship was perfected in 1981. Simon admits Thibodaux was not listed as a co-breeder of his foals until 1983. Although the parties may have discussed the prospect of associating to further their mutual interest earlier, the evidence strongly suggests they did not attempt to solidify the terms of their contractual undertaking until September, 1982. Thibodaux's conversations at race tracks and the occasional advice he gave Simon on purchasing horses did not make him Simon's agent.
Simon also argues the trial court erred in granting a directed verdict in favor of Donald Dupuis. He alleged Dupuis and Thibodaux entered into a business relationship in which they agreed to share ownership of mares, breed the co-owned mares to Simon's stallion without payment, and profitted from the sales of the offsprings. The trial court granted a directed verdict in favor of Dupuis finding Simon failed to present any evidence to establish Thibodaux and Dupuis co-owned any thoroughbred mares. Thus, Simon failed to prove any offspring were born from the breeding of co-owned mares to Simon's stallions. Simon did not offer any testimony or other evidence contradicting the testimony of Thibodaux and Dupuis.
A motion for directed verdict is proper if the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes reasonable men could not arrive at a contrary verdict. Cliburn v. Colonial Penn Insurance Co., 583 So.2d 103, 105 (La.App. 3d Cir.1991). The trial court did not err in holding reasonable men, considering the uncontradicted testimony, would conclude Dupuis and Thibodaux did not own, jointly, any mares; and, as a consequence, they could not have bred them to Simon's stallion.

THIBODAUX'S CONTENTIONS ON APPEAL
In his first assignment of error, Thibodaux asserts the trial court erred in failing to classify the liability of Simon and MidSouth in the conversion claim as in solido. We addressed this issue earlier in the opinion, finding Simon and MidSouth liable in solido for conversion of the Breeder's awards checks.
Thibodaux also contends the trial court erred in preventing him from presenting evidence to support his claim for general damages allegedly arising from Simon's breach of contract. In order to recover nonpecuniary damages as a result of a bad faith breach of contract, the pleadings must contain a specific allegation of fraud or bad faith within the meaning of LSA-C.C. arts. 1958 and 1997. Commercial Nat'l Bank in Shreveport v. Audubon Meadow Partnership, 566 So.2d 1136 (La.App.2d Cir.1990); Wright Brothers Corp. v. Colomb, 517 So.2d 1194 (La.App. 4th Cir.1987), writ denied 519 So.2d 110 (La.1988). The trial court after examining the record stated that "bad faith has not been alleged, even generally [by Thibodaux]." After examining his Second Supplemental and Reconventional Demand, which restates all the allegations upon which he based his claims, we join the trial judge in finding he failed to articulate facts sufficient to allege bad faith or fraud. Therefore, this assignment of error is without merit.

DECREE
Accordingly the judgment below is reversed, except that portion assessing costs *1375 against the parties. Judgment is hereby rendered awarding Thibodaux the following amounts on his conversion claims against Simon and MidSouth Bank, in solido: $16,367.15 representing breeder's awards owed him; and $25,000.00 as general damages. Judgment is further rendered against J. Minos Simon awarding Thibodaux $150,000.00 as just and reasonable compensation and damages related to the contract existing between them. All costs incurred on appeal are cast equally against the parties, J. Minos Simon, L.P. Bud Thibodaux, and MidSouth Bank.
REVERSED IN PART AND RENDERED.
COOKS and SAUNDERS, JJ., concur and assign written reasons.
COOKS and SAUNDERS, Judges, concurring.
Simon also complains reversible error occurred when "counsel for appellee persistently made calculated inflammatory remarks designed to appeal to class, racial and political prejudice, emphasized the wealth of the appellant, made assertions unsupported by the evidence, and elicited prohibited character evidence, thereby destroying any opportunity for the jury to render a fair and unbiased verdict, all to appellant's gross prejudice." We find this argument persuasive.
Simon charges Thibodaux's attorney throughout the trial attempted to appeal to class prejudice by accusing him of using his wealth and power as a trial lawyer not only to extend the present litigation but to manipulate and take advantage of people less fortunate. He also charges the attorney inappropriately attempted to assail his character by referring to his divorces; creating the "illusion" he was a tax evader; inquiring whether he was retained to represent David Duke; implying he placed no value on friendship; and insinuating he treated people cruelly and without compassion. The defense points out, however, Simon's trial attorney failed to contemporaneously voice objections to most of the evidence and comments he now complains on appeal was inadmissible below.
A party may, by his acts or omissions, waive or be estopped from objecting to the admission or exclusion of evidence. Such waiver or estoppel may arise from failure to object, from acts done or omitted before the evidence is offered, as by failure to object to previous similar evidence, or from some affirmative act done after the ruling on the evidence. Pitts v. Bailes, 551 So.2d 1363 (La. App. 3d Cir.), writ denied, 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La.1990); LaHaye v. Allstate Insurance Company, 570 So.2d 460 (La.App. 3d Cir.1990), writ denied, 575 So.2d 391 (La.1991). A party who does not contemporaneously object to the admissibility of evidence or testimony at trial and state the reason for the objection is deemed to waive such objection. The party may not attack the admissibility of the evidence for the first time on appeal. LSA-C.E. art. 103; Temple v. Liberty Mutual Insurance Company, 330 So.2d 891, 894 (La.1976); LaHaye, supra. Although, Simon's counsel did not voice objection to each remark he now contends was calculated to arouse the passion or prejudice of the jurors, we do not believe this failure constituted a waiver of his right to a fair trial on the merits of the case.
The interjection in a civil jury case of inflammatory remarks or references to extraneous matters, not relevant to issues presented in a case, is "highly improper." Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68, 73 (La.App. 3d Cir.1989), writ denied, 546 So.2d 1218 (La.1989); Temple v. Liberty Mutual Insurance Co., 316 So.2d 783 (La.App. 1st Cir.1975), modified on other grounds, 330 So.2d 891 (La.1976). While great latitude is afforded in argument before a civil jury and a trial court is granted wide discretion in ruling on objections to alleged improper remarks, we are not required to close our eyes when the record discloses a studied purpose to awaken human biases.
With approval this court referenced the following rule adopted by a majority of States set forth in 88 C.J.S. Verbo Trial Sec. 187, pp. 371-373:

*1376 "`Inflammatory remarks made by counsel in argument which are calculated to appeal to the passions and prejudices of a jury are improper. The Parties to an action are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice, and counsel should confine his argument to the evidence in the case and to the inferences properly to be drawn therefrom, and should avoid appealing to the prejudice of the jury. Arguments and comments by counsel calculated to arouse the passions and prejudices of a jury by presenting to them considerations extraneous to the evidence are highly improper. The test of whether argument of counsel is prejudicial or inflammatory is whether such comment is unreasonable or unfair in the eyes of the law. When the language used is such as discloses a studied purpose to arouse the prejudices of the jury based on facts not in the case, the court cannot overlook it or consider that a party against whom such effort has been made has had a fair consideration of this case at the hands of the jury.'"
Further, Louisiana courts have long held that a party's past deeds or predilections, be they judged good or bad, are inadmissible in cases with few exceptions. Character evidence in a civil case is generally inadmissible. LSA-C.E. art. 404. This exclusionary rule, like the majority rule referenced above, recognizes the inherent danger that jurors may convict, punish, or hold liable a person for the acts alleged in a case, though unproven by the evidence presented, because of past behavior or perceived misdeeds.
Simon references the following remarks by defense counsel and testimony elicited which he alleges improperly influenced the jury's verdict:
Power and Wealth References
1.
Perret's Opening Statement
"Bud didn't know Minos that well. He knew he was a famous trial lawyer. He knew he had a bunch of money. ...
* * * * * *
He [Simon] told Bud at that September 1982 meeting, he said, "Bud, I've got a sixteen million ($16,000,000.00) dollar net worth. I've got all the cash I'll ever need for my entire life, but I don't have a race horse.
* * * * * *
Bud also knew he had a lot of money, because he enticed him. He asked him out to his yacht, a yacht he bought from the Rockefellers. He wined and dined him on the yacht, made sure that he saw that he had the money so that he could spend on the horses. He also told Bud, he said, "Bud, I'm a trial lawyer. ..."
* * * * * *
But when they went to him, he [Simon] said, "look, I don't do corporations. I'm a trial lawyer. I'm a trial lawyer. I make my living convincing jurors to vote in my favor." (Emphasis added by Simon).
2.
Perret's cross-examination of Simon
Q. Mr. Simon, you've been a lawyer for over forty (40) years, have you not?
A. Since 1946.
Q. You are a trial lawyer, are you not?
A. That's what I do primarily.
Q. You represent yourself as being a trial lawyer, do you not?
A. Yes.
Q. That's your area of expertise, is it not?
A. I give advise, that's an area of expertise, also. I give a lot of advice. I give a lot of opinions. I try cases when I have to try cases.
Q. But you principally hold yourself out as a trial lawyer, do you not?
A. Mr. Perret, I'm sorry, I don't mean not to answer your question. I've got a sign out in front of my office that says, "J. Minos Simon, Attorney at Law."

*1377 Q. You pride yourself on your toughness, don't you not, [sic] Mr. Simon?
A. Pardon?
Q. You pride yourself on your toughness, don't you?
A. Pride myself on my what?
Q. On your toughness and your competency as a lawyer, do you not?
A. No, I don't pride myselfI pride myself on being a person who works, prepares himself, and it [sic] not flippant or careless about giving an opinion to anybody out there. I pride myself on working hard and trying to do a good a job, [sic] that's all. I don't pride myself on being tough at all. I don't think I'm tough.
3.
Perret's Questioning of Simon's CPA
Q.... Financially, Mr. Simon had the wherewithal to stand twice the amount of dollars that were going out of the door, right, John?
A. By "stand" you mean like not go bankrupt?
Q. No.
A. Like nobody can stand losses, okay. Standing them means, you know, you don't mind them....
Q. He could have withstood more than twice the amount of losses that were being sustained, could he not have, Mr. Wright?
A. That's true, if you mean could he withstand it and not be insolvent. I would think that's true.
4.
Perret's Closing Argument
... The man who bought John Rockefeller's yacht. The man who told Bud Thibodaux before they got into business that he was worth sixteen million ($16,000,000.00) dollars. The man who got a thriving law practice making millions of dollars each year. ...
* * * * * *
No, Ladies and Gentlemen, Mr. Simon didn't just tell a few inconsistences, didn't just try to stir you away from the truth. He took the eventshe's a trial lawyer. He knows that's what he's got to do. A good offense is the best defense. And he went on offense full speed ahead. He knew that he had to sling some mud at Bud Thibodaux for you to even think about ruling in favor of Mr. Simon. Boy, has he diverted your attention. What did he do? Well, the first thing he did was he went on the most extensive discovery in any case that I've ever seen, probably the most extensive discovery expedition ever conducted by a lawyer. ...
* * * * * *
Ladies and Gentlemen, you know the difference between a lawyer's imagination and reality, and you heard a whole lot about a lawyer with power like Minos Simon can do a lot of damage. And that's precisely what he did with Bud Thibodaux. He took nine (9) years out of Bud Thibodaux's life, three (3) years when he worked, and the six (6) years that this lawsuit has been pending. A scary thing, with a lawyer with a sharp pen, ability to write pleadings, file discovery motions, and twist the truth. Who is going to be next? Who is going to be next? The man will stop at nothing. You have the opportunity to send the message, to keep him from doing it again.
* * * * * *
How about Don Dupuis.... Another victim of an angry, powerful lawyer.

* * * * * *
... Because he doesn't need the money. He doesn't need the money. He's got all the money in the world. He didn't get *1378 into this business for the money. He got into it for the ego. And that's what he's into, the powerful lawyer who has all the money. You see, you can have all the money in the world.

* * * * * *
And that's why he needed Bud Thibodaux, and that's what Bud Thibodaux did, and that's what Bud Thibodaux got him. The next thrill for a powerful hungry lawyer. That was the next thrill. You know, what was next after Rockefeller's yacht? What was next? He got a little taste of it, got a little success.
* * * * * *
... Our forefathers who set in motion knew a lot about law, but they also knew a lot about people. And they also knew about powerful people, and they knew what powerful people can do to other people, like lawyers in this case ... Ladies and Gentlemen, you are Bud Thibodaux's salvation. He's been through it nine (9) yearsnine (9) years, Ladies and Gentlemen. Today for the first time, Bud and Minos Simon are on level ground. He doesn't have one leg up. He doesn't have the advantage, because he's the lawyer that knows the rules to the game.

* * * * * *
Ladies and Gentlemen, power is good in the hands of the powerful, only if the powerful are good. The person with the power in this case wasn't good, and that's why we have this lawsuit, and that's why Bud Thibodaux suffered like he has. He made the mistake of trusting a lawyer, going into business with a lawyer for three (3) years ...
References to Simon's Divorces
1.
Perret's Opening Statement
One of the times was in 1983 and 1984, when he was in the midst of his fourth divorce. He wanted to pay his wife off. "Oh, I'll just pay [sic] the horses and give her the cash."
2.
Perret's Cross-examination of Simon
You went through your fourth divorce during this period of time, did you not?
3.
Perret's Examination of Simon's CPA
Q. Now, let's talk about other services that you've rendered for Mr. Simon, particularly in between '82 and '85, which is the issue before us today. His divorce during that period of time, you ended up settling the whole thing for both he and his spouse, didn't you?
References to Extent of Proceedings
1.
Perret's Opening Argument
"But in spite of the fact that his claims are unwarranted, what he's been able to do is keep his lawsuit going for six (6) years, and he has put Bud Thibodaux under a microscope that nobody has ever been under. He's the consummate trial lawyer. He is the most meticulous person. He has looked at every check the man has ever written. He's examined his tax returns. If there's a document he possesses, Minos Simon has looked at it, everything.
* * * * * *
This suit has had over a hundred (100) motions. Over a hundred (100) motions. We've been to the appellate courts, twenty-five (25) or thirty (30) times, and to the Supreme Court, and we haven't even gotten to the trial yet. That is what Bud Thibodaux has been put through the last six (6) years.
2.
Perret's Closing Argument
Today this Story isn't going to end for Bud Thibodaux. No. It's going to last for at *1379 least two (2) more years, because we know we're going to have to go to the appellate courts, we know we're going to have to go to the Supreme Court. But we know that's going to happen.
3.
Perret's cross-examination of Simon
Q. Mr. Simon, Mr. DeLauney and your son here today are not the first two (2) lawyers who have represented you in this
MR. DELAUNEY. OBJECTION. Your Honor, I object to the relevancy of that.
MR. PERRET. Excuse me.
Q. who have represented you in this case, are they, Mr. Simon?
MR. DELAUNEY. OBJECTION. Your Honor, I object to the relevancy of that.
4.
Perret's examination of Thibodaux
Q. Mr. Thibodaux, do you or do you not have any personal knowledge of a relationship between Mr. Simon and the MidSouth National Bank?
A. Yes, I do, of a personal relationship?
Q. Tell the Jury what that relationship is.
A. Tony Fazzio, an attorney, who is chairman of the Board of MidSouth Bank represented Mr. Simon in this case for at least over two (2) years, that I know of. And he's just resigned as Mr. Simon'sone of nine (9) attorneys whose [sic] resigned from the case.

5.
Perret's Closing Argument
What did he do? He hired the Chairman of the Board to represent him in the case. He hired the Chairman of the Board. The Chairman of the Board, who was his fourth or fifth lawyer in the case, in hopes that he could work something out.
Creation of Illusion of Tax Evasion
1.
Perret's examination of Thibodaux
Q. Did he tell you why?
A. Yes, he [Simon] said, "if I receive the hundred thousand (100,000.00) dollars as income, I'm in a fifty (50%) percent tax bracket, fifty (50%) percent of that money is going to go to taxes, but I bought Tudor Lass years back where I can take capital gain. And by taking capital gain, he only has to pay twenty (20%) percent taxes. So, they cut a deal. The mare was sold, Mr. Perrez paid him a hundred thousand ($100,000.00) dollars, and Mr. Simon saved thirty-thousand ($30,000.00) dollars in taxes.
* * * * * *
Q. Bud, was this transaction with Tudor Lass the only transaction that you are aware of involving Mr. Simon where taxes came into play?
A. There is another incident where he did basically the same thing. That was with Mr. Don Dupuis.... Mr. Dupuis owed Mr. Simon five thousand ($5,000.00) dollars. And he had a mare called Smooth Venture. And again, the same transaction, capital gains. What he did was added two thousand ($2,000.00) dollars to the price of the mare, and he sold the mare to Mr. Dupuis for seven thousand ($7,000.00) dollars. And again, instead of taking the fifty (50%) percent tax, he ended up having to pay twenty (20%) percent in taxes. So, he did it a second time.
Allegations of Bad Character
1.
Perret's Opening Statement
But that offended Mr. Simon. He didn't like that. He didn't like that a friend *1380 would come help him [Thibodaux]. So, what did he do, he sued him [Dupuis], too.
* * * * * *
He [Simon] sued Don Dupuis because he's Bud Thibodaux's friend, because Bud Thibodaux was helped by Don Dupuis. And he thought he could create friction between the two (2) of them and keep him from helping him, in an effort to break Bud Thibodaux. He knew he could break Bud, because he knew he wouldn't have to pay legal fees, and he knew that Bud couldn't afford a legal battle that he could create ...
* * * * * *
And he [John Wright] told Bud several times, "Bud, if you ever leave Minos, you're going to get sued. You're going to get sued. Of course, John Wright was not the only person that told that to Mison [sic]. His law partners had told him that, also.

2.
Perret's examination of Thibodaux
Q. What, if anything, did John tell you in response to that concern?
MR. DELAUNEY. OBJECTION. Hearsay. Mr. Wright has testified.
MR. PERRET. Judge, again, it doesn't go to the truth of the matter asserted. It only says what he told him.
MR. DELAUNEY. Judge, it is being offered especially for the truth. Mr. Wright has testified. We urge our objection.
MR. PERRET. Only that it was said, Judge.
THE COURT. I'll allow it. Let's see where it goes.

A.... And Mr. Wright told me, "if you leave, he is going to sue you."
* * * * * *
A.... I know how he treats people once he's involved with them and the
MR. DELAUNAY. OBJECTION. Your Honor
A. relationship
MR. DELAUNAY. OBJECTION. Your Honor, I'm going to object now to the responsiveness to the question.
THE COURT. Sustained.
Q. What was this concern you had over how he treated people?
* * * * * *
THE COURT. If he can answer the question based on personal observation, avoiding hearsay, I'll allow it.
Q. Can you respond under those parameters, Mr. Thibodaux?
A. I think I can....
3.
Perret's examination of Simon
Q. Mr. Simon, you have recently been retained to represent David Duke, haven't you?
A. No, I haven't been retained.
Q. You don't represent Mr. Duke or any of his organizations?
A. No, I don't.
After reviewing the record in entirety, we simply cannot view the cited instances as isolated and harmless. Though counsel for the defense insists the remarks and testimony were relevant and, thus, admissible to establish various contentions he alleges were material to the issues raised, we do not agree. The jury in this case was called to decide only whether a contract existed between Simon and Thibodaux; if so what were their respective duties and liabilities for any breaches; and whether certain funds were wrongly converted. It strains the imagination of reasonable minds to fathom any purpose for a majority of the cited remarks and testimony elicited by defense counsel other than to appeal to the jurors' passion and prejudices. Whether Simon was retained by *1381 David Duke,[25] divorced four times, treated people bad, possessed a lot of money, owned a yacht purchased from the Rockefellers, zealously practiced his profession, filed other suits, vigorously pursued the present case, retained nine different attorneys, and took advantage of tax loopholes were not relevant to the issues presented in this case. We cannot say the introduction of these extraneous matters at the trial did not impact the jury's deliberation and the verdict it ultimately rendered. We believe such occurred despite the trial judge's admonition to the jurors that arguments of counsels were not evidence. The damages awarded to Thibodaux, particularly on the conversion claim, further convinces us the jurors were moved by passion or prejudice rather than the law and admissible evidence. Although Simon did not voice objection during defense counsel's opening statement and only once during his closing statement, he did object numerous times throughout the trial to defense counsel's attempts to interject testimony regarding his divorces and the number of attorneys he retained to represent him in this case. Further Simon objected to Thibodaux's testimony regarding statements made to him by a third person that Simon would sue him; Simon threatened to send his horse trainer to jail on criminal charges for theft; Simon forced an employee to drive from Ville Platte to his ranch many miles away to jump start a bulldozer; and Simon refused to pay an African American who he hired to whitewash a fence and threatened to jail him.
In brief, defense counsel argues the testimony regarding Simon's divorces was relevant to show his real motive for deciding to sell all of his horses was "somehow" connected to settling the community interest of his wife. Defense counsel, however, does not explain why it was necessary to mention Simon "went through [his] fourth divorce during this period." Simon did object timely to testimony regarding the number of attorneys he retained and closing argument that in all likelihood Simon would appeal this case. Still, defense counsel attempts to place blame entirely on Simon for failing to seek an admonition from the trial judge. The law does not place such responsibility on a party seeking to exclude improper evidence. Thibodaux's testimony regarding statements made by a third party and Simon's treatment of workers were inadmissible. Although defense counsel assigns a laudable purpose for offering this evidence, the rules of evidence bar its admission. Character evidence is ordinarily inadmissible in civil cases; and, we are unable to find any exception in law or jurisprudence permitting the introduction of such evidence in this case. The cumulative and damning impact of this testimony and other references by the defense to extraneous matters were not overcome by the trial judge's instructions or his decision to merely sustain Simon's objections in certain instances.
Whether we review the record de novo pursuant to our constitutional authority[26] or apply the manifest error standard of review does not change the result we unanimously agree is compelled by the admissible facts and the law.
NOTES
[1] Prior to his association with Simon, Thibodaux had not been listed as a breeder in any racing form. He had been involved in the breeding of only two horses. As Thibodaux explained "[he] had just started breeding horses in 1982."
[2] Describing the business arrangement formed between he and Simon, Thibodaux stated:

"My responsibilities toward the joint venture, I would supervise the operation. I would find the mares that we would purchase. I would select the stallion that we breed the mares to. I would supervise everything, from what type of feed, who was going to come and do the horse, trimming of the feet, to what sales we were going to put the horses into. Basically, everything, the whole operation."
[3] Simon asserted Thibodaux refused his offer to purchase the 100 shares of stock belonging to Verret and used the money he paid for the horses to acquire Verret's shares for himself. This Thibodaux did, Simon testified, without his consent; and, thereby, breached a fiduciary duty owed him.
[4] The actual cash amount delivered to Simon, according to Thibodaux, was short $700; and, the bills were stapled together. When the funds were delivered to Simon, Thibodaux testified, Simon unstapled the bills and counted the amount before handing him two thousand dollars. No person witnessed the delivery of the funds to Simon or the payment to Thibodaux. Simon denies the exchange took place; and insists Thibodaux accepted the amount as a "kickback."
[5] When Thibodaux was asked whether he knew any person that could corroborate what Simon promised him, he stated:

"No, I can't. And everytime the discussion, and it came up numerous times. We just didn't talk about what the deal was once, twice, three times, numerous times we talked about it. And for some strange reason, everytime it came up, whether we were at John Wright's office, everytime we talked about the deal, it was always just he and I, for some strange reason, but that's how it was."
[6] The name of Simon's horse farm.
[7] The checks never arrived at Fasig-Tipton, although Thibodaux maintained his wife mailed them. Simon accused Thibodaux of converting the checks by retaining possession of them.
[8] Louisiana has a breeder's award program. Breeders of horses born in Louisiana which run in Louisiana bred accredited horse races are entitled to receive twenty percent of the purses.
[9] After accepting Thibodaux's proposal, Simon testified in July 1981 he decided to change the name of his ranch from Beau Buff Charlais Ranch to Dixieland Farm. The latter name, he opined, seemed more fitting and formal for his horse operation.
[10] Also, Simon testified, Thibodaux convinced him to build a 24 stall horse barn by assuring him a profit from boarding and training horses owned by others at his farm for a price. Simon stated instead of "filling-up" the barn with tenants, as he promised, Thibodaux "never had any more than two or three horses" from other owners at the barn.
[11] Simon stated by telephone he requested that Franks not disclose he was attempting to liquidate his horse business because "people would think they could offer him anything" for the horses.
[12] Simon later dismissed Fasig-Tipton as a party defendant in the suit.
[13] This section of the verdict tracts an interrogatory submitted to the jurors which contained the disjunctive "or." The jurors' answer in the affirmative to the interrogatory, thus, is confusing. Whether the jurors found Simon promised Thibodaux a ten percent ownership interest or simply a ten percent interest, without conveying ownership, in every horse purchased during the relationship and their foals is not certain.
[14] Again, this interrogatory contains the disjunctive "or." It is uncertain whether the jurors found Simon promised Thibodaux ten percent of all winnings to every horse purchased by or on behalf of J. Minos Simon or simply a ten percent interest in every horse purchased. We note, as well, the interrogatory did not mention the "foals" born during the relationship. Up the Apalachee, whose winnings account for most of the earnings received by Simon for racing horses, was a foal mothered by Party Up.
[15] The Louisiana Constitution, article 5, § 10(B), provides:

Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.
[16] We pretermit discussing Simon's argument that the verdict is infirmed because of an appeal to jury bias or prejudice. All panel members agree the jury's award is manifestly erroneous in part and all agree in the result. The views of the members finding Simon's argument persuasive on this issue are expressed in the concurring opinion which follows.
[17] Title IV of the Louisiana Civil Code of 1970, Of Conventional Obligations, consisting of Articles 1761 through 2291, was revised, amended and reenacted by Acts 1984, No. 331, Section 1, effective January 1, 1985, to consist of Article 1906 through 2057. The contract forming the basis of Thibodaux's claims existed prior to the effective date of the 1984 revisions. Thus, we referenced and applied the articles in effect prior to January 1, 1985.
[18] Simon, in writing, twice acknowledged entering a private contract with Thibodaux. In letters addressed to the Louisiana Thoroughbred Breeders Association on September 17, 1985 and, again, on December 19, 1985, Simon stated:

Mr. L.P. "Bud" Thibodaux, for more than two years up to the middle of August, 1985, has functioned as my advisor for breeding purposes and has exercised complete supervision over my thoroughbred horse operation. It was he who made all decisions as to my breeding program, including the selection of the stud, the place and time of breeding and of foaling. He decided the horses to buy and sell. He decided the fee, including hay, alfalfa, oats and straw to buy and from whom and in what quantity. He decided who was to be hired and who was to be fired. And as compensation for his services, I arranged for him to receive an ownership of forty percent in all breeding fees, plus cash compensation.
* * * * * *
Some time ago, I entered into a private contract with L.P. "Bud" Thibodaux, your board member, under the terms of which I agreed to award to him in discharge of my oral contract with him, a certain percentage of any breeder's award that I might receive. This, however, is a private contract between Thibodaux and me. You are not to send any check directly to Thibodaux, representing any breeder's award.
[19] Simon further contends that the breeder's awards granted by the jury was somehow duplicated because these amounts were included in the damages awarded for both breach of contract and conversion. Because we have reviewed the jury's award and found error, this argument is rendered moot.
[20] In making this award, we have considered and factored the $28,000.00 Thibodaux admits was advanced to him by Simon and included a sum for expenses incurred and due him in connection with Simon's horse operation.
[21] This provision was amended by Act 1992, No. 1133, Section 3, effective January 1, 1994 "to take account of special Louisiana concerns, particularly the lack of a common-law background from which the elements of the tort of conversion could be drawn." LSA-R.S. 10:3-420, 1992 Louisiana Comment. This section, renumbered as 3-420, now specifically recognizes a cause of action for conversion of an instrument.
[22] We deem the other arguments advanced by Simon in brief on this claim either moot or meritless.
[23] Whether the verdict form should have included the names of the released defendants and provide for an apportionment of fault as to them is a question we need not address considering the parties' failure to present the necessary evidence. In passing, we note the general rule in Louisiana is the comparative fault concept is not applicable in intentional tort cases; and, we have refused to apply it in conversion cases. Broussard v. Lovelace, 610 So.2d 159 (La.App. 3rd Cir.1992), writ denied, 615 So.2d 343 (La.1993).
[24] Simon's contentions regarding certain alleged instructional and verdict form errors also are without merit.
[25] As pointed out by Simon, several members of the jury were African Americans. David Duke, a former member of the Ku Klux Klan, was a candidate for Governor of this State. Simon notes, in brief, he received, if any, at most 4% of the votes cast by African Americans.
[26] The present litigation has been on-going for nine years. It would not serve the ends of justice for us at this late juncture to remand the case for new trial. The record lodged before this court is sufficient; and we have reviewed the jury's verdict to determine whether it was supported by "proper evidence." As instructed by the Louisiana Supreme Court, an appellate court has a constitutional duty to review the facts, as well as the law, and to render a judgment on the merits. Daigle v. Coastal Marine, 488 So.2d 679 (La. 1986); Temple, supra; Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Such review is not restricted by the general standard of appellate review; but rather the appellate court is allowed to review the record de novo and render a judgment based on the evidence properly admitted. Oswalt v. State, DOTD, 93-850 (La.App. 3d Cir. 3/30/94), 640 So.2d 388 writ denied, 641 So.2d 207 (La.1994); Manuel v. Wal-Mart Stores, 93-1243 (La.App. 3d Cir. 5/4/94), 640 So.2d 579 writ denied, 642 So.2d 1291 (La.1994). We have done so.